CENTER FOR DISABILITY ACCESS
Chris Carson, Esq., SBN 280048
Raymond Ballister Jr., Esq., SBN 111282
Phyl Grace, Esq., SBN 171771
Dennis Price, Esq., SBN 279082
Christopher A. Seabock, Esq., SBN 279640
8033 Linda Vista Road, Suite 200
San Diego, CA 92111
(858) 375-7385; (888) 422-5191 fax
phylg@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **Daniel Lopez**, | ) Case No.: 2:18-cv-03269-MWF-JC |
| Plaintiff, | ) |
|  | ) **PLAINTIFF'S TRIAL BRIEF** |
| v. | ) |
| **Joel Mauricio Jaco**; and Does 1-10, | ) Bench Trial: March 10, 2020 |
| Defendants. | ) Time: 8:30 a.m. |
|  | ) Complaint Filed: April 19, 2018 |
|  | ) |
|  | ) Honorable Judge Michael W. Fitzgerald |
|  | ) |

## I.      PRELIMINARY STATEMENT

The Plaintiff is Daniel Lopez, a California resident with physical disabilities. Mr. Lopez is a paraplegic. He cannot walk and uses a wheelchair for mobility. Mr. Lopez has a specially equipped van with a ramp that he controls with a remote. The ramp deploys from the passenger side of the van to accommodate his wheelchair.

Defendant Joel Mauricio Jaco owns the Angie's Liquor store ("Store"). The Store is a business establishment and place of public accommodation, located at 1637 Firestone Blvd., Los Angeles, California.

Parking spaces are one of the facilities, privileges, and advantages offered by Defendant to patrons of the Store.

On February 19, 2018, Mr. Lopez went to the Store to purchase drinks. Mr. Lopez found that, while the Store has specifically marked parking spaces, none were reserved for persons with disabilities. While there was a standard-size accessible parking space at the nearby 99 Cent Store, it was narrow and not accessible to vans. Further, utilizing this stall would have required Mr. Lopez to travel behind parked cars and across vehicular paths of travel without the safety of a cross walk to reach the Store. Additionally, the reserved parking stall and access aisle were not level with each other because there was a built up curb ramp, which extended into the access aisle.

Mr. Lopez needs a van accessible parking space with an access aisle so that he can deploy his ramp and exit his van. Because he was unable to safely park, he left the property. The lack of van accessible parking space caused Mr. Lopez difficulty, discomfort, and frustration.

On March 29 & 30, 2018, Corey Taylor, an investigator for the Plaintiff, investigated the Store and confirmed the parking conditions Mr. Lopez encountered. Additionally, Mr. Taylor found that the ramp at the entrance of the Store does not have a landing and has a 19.4% slope. Inside the Store, the paths of travel in and throughout the merchandise aisles were narrow and measured 30 inches wide.

As recently as August 7, 2019, Mr. Taylor returned to the Store for a follow up investigation. This time he found that a new wall mounted sign indicating accessibility had

2

been installed near the reserved parking space. It also appeared that the reserved parking space may have been re-painted. However, no structural changes were made to the parking or the entrance at the Store.

The Store is located only about three miles away from Mr. Lopez' home and is, therefore, a convenient place for him to buy drinks. Once the violations are removed, he plans to visit the Store on a regular basis.

Defendant is not raising financial wherewithal defense.

## II. ESSENTIAL ELEMENTS

Mr. Lopez alleges violations of the Americans with Disabilities Act and the Unruh Civil Rights Act. The analysis under these Acts is the same because any violation of the Americans with Disabilities Act is a violation of the Unruh Civil Rights Act. Under Title III of the Americans With Disabilities Act of 1990 ("ADA"), the general rule is: "No individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

There are three essential elements to a disability discrimination case. To prevail, the plaintiff must demonstrate: (1) The plaintiff is disabled within the meaning of the ADA; (2) The defendant owns, leases, or operates a place of public accommodation; and (3) The defendant discriminated against the plaintiff within the meaning of the ADA. Roberts v. Royal Atlantic Corp. 542 F.3d 363, 368 (2nd Cir. 2008). The first two elements are clearly defined by statute. Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Places of public accommodation are codified and include stores, such as Defendant's. 42 U.S.C. § 12181(7)(E).

As to the third element, the term "discriminated" is a little misleading:

> Although the term "discrimination" evokes images of active
> discrimination, e.g., a person is expressly forbidden to enter the

3

premises because of his or her disability, Congress also intended to eliminate more passive forms of discrimination, e.g., a person is physically unable to enter the premises because it lacks a wheel-chair accessible entrance. H.R.Rep. No. 101-485(II) at 99 (1990), reprinted at 1990 U.S.C.C.A.N. 303, 382 (a primary purpose of the ADA is to "bring individuals with disabilities into the economic and social mainstream of American life.")

Independent Living Resources v. Oregon Arena Corp. 982 F.Supp 698, 706 fn. 1 (D. Org. 1997).

One of the specific forms of discrimination identified under the ADA is a failure to remove architectural barriers where such removal is readily achievable. Roberts v. Royal Atlantic Corp., *supra*, 542 F.3d at pp. 368-9; 42 U.S.C. § 12182(b)(2)(A)(iv). Architectural barriers are defined by the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"). Chapman v. Pier 1 Imports (U.S.) Inc. 631 F.3d 939, 945 (9th Cir. 2011).

Thus, the following is a simplified statement of the elements necessary for the plaintiff to prove discrimination under this section:

(1) The Plaintiff is disabled [42 U.S.C. § 12102(1)(A)];

(2) Defendant's facility must be a place of "public accommodation" and, therefore, governed by Title III of the ADA [42 U.S.C. § 12182(a)];

(3) Defendant's facility must have had unlawful architectural barriers [42 U.S.C. § 12182(b)(2)(A)(iv)];

(4) The Plaintiff must have encountered the architectural barrier precluding his full and equal access to the facility [42 U.S.C. § 12188(a)].

### III. THE LACK OF A COMPLIANT VAN ACCESSIBLE DISABLED PARKING SPACE CONSTITUTES AN UNLAWFUL ARCHITECTURAL BARRIER.

Under the ADAAG, if the business provides between one and 25 parking spaces, it must provide at least one handicap parking space, which must be van-accessible (having an eight-foot access aisle). ADAAG § 4.1.2(5)(a), (b). "[B]oth the ADAAG and Title 24 (2002) require that one out of every eight spaces be van accessible, defined as an accessible space adjacent to a 96–inch–wide access aisle." <u>Moeller v. Taco Bell Corp.,</u> 816 F.Supp.2d 831, 852-53 (N.D. Cal. 2011) [noting the problem with access aisles that are too small: "If she had parked in the designated space and a car later parked in the adjacent space, there would not have been enough space for her to deploy her ramp and enter her van"]. **The failure to provide a proper access aisle is a clear violation of the law.** See <u>Wilson v. Pier 1 Imports (US), Inc.,</u> 439 F.Supp.2d 1054, 1069 (E.D. Cal. 2006) [finding a violation of the ADA and Unruh Act because the access aisle at the accessible parking space was only 62 inches and not 96 inches].



(Source: www.sos.ca.gov)

To be compliant, "[a]ccessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility []. [Van-accessible spaces] shall have an additional sign

5

'Van-Accessible' mounted below the symbol of accessibility. Such signs shall be located so they cannot be obscured by a vehicle parked in the space." ADAAG § 4.6.4. Further, all accessible parking spaces must be outlined in blue and display the international symbol of accessibility. California Business Code ("CBC") 1129B4; ADAAG §§ 4.1.2(7)(a), 4.30.7. "The words "NO PARKING" shall be painted on the ground within each 8-foot... loading and unloading access aisle. This notice shall be painted in white letters no less than 12 inches... high and located so that it is visible to traffic enforcement officials." CBC 1129B3.

Further, "a handicap parking spaces and its access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions." ADAAG § 4.6.3.

Here, the Store did not provide accessible spaces to its customers. The nearby 99 Cent Store did provide a standard accessible parking space, but it was not van-accessible, not properly signed and designated, and not level  . Defendant's failure to provide a van accessible parking space is a violation of the ADA

## IV. THE LACK OF AN ACCESSIBLE PATH OF TRAVEL CONSTITUTES AN UNLAWFUL ARCHITECTURAL BARRIER.

Under the ADAAG, "[a]t least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility." ADAAG § 4.1.3(1)(a). "At least 50 percent of all public entrances... shall comply with 4.14. At least one must be a ground floor entrance." ADAAG § 4.1.3(8)(a)(i). "Entrances... shall be part of an accessible route complying with 4.3. Such entrances shall be connected by an accessible route... to accessible parking and passenger loading zones... They shall also be connected by an accessible route to all accessible spaces or elements within the building or facility." ADAAG § 4.14.1.

"At least one accessible route... shall be provided from... accessible parking, and passenger loading zones... to the accessible building entrance they serve. The accessible route shall, to the maximum extent feasible, coincide with the route for the general public." ADAAG § 4.3.2(1). "**An accessible route does not include stairs, steps, or escalators.**" ADAAG

6

§ 4.3.8 (emphasis added). "If an accessible route has changes in level greater than 1/2 in [],
then a curb ramp, ramp, elevator, or platform lift... shall be provided..." <u>Id</u>. At existing facilities,
ramps can have a maximum slope of 12.5%. ADAAG § 4.1.6(3)(a)(i)&(ii). Ramps must have a
level landing at both the bottom and top of the ramp. ADAAG § 4.8.4. "The minimum clear
width of an accessible route shall be 36 in[ches]..." ADAAG § 4.3.3.

The lack of accessible paths of travel into the Store's entrance and in and throughout the
merchandise of the Store are unlawful architectural barriers under the ADA.

## V. THE PLAINTIFF ENCOUNTERED THE PARKING VIOLATION AND IS DETERRED FROM PATRONAGE.

Mr. Lopez personally encountered the parking violation and continues to be deterred by
the barrier. Mr. Lopez visits the area regularly, and would like to go to the Store with confidence
that he can use the parking spaces independently. "[Where] a plaintiff has visited a public
accommodation on a prior occasion and is currently deterred from visiting that accommodation
by accessibility barriers establish that a plaintiff's injury is actual or imminent." <u>Doran v. 7-
Eleven, Inc.</u>, 524 F.3d 1034, 1041 (9th Cir. 2008). "We have found actual or imminent injury
sufficient to establish standing where a plaintiff demonstrates an intent to return to the
geographic area where the accommodation is located and a desire to visit the accommodation if
it were made accessible." <u>D'Lil v. Best Western Encina Lodge & Suites</u>, 538 F.3d 1031, 1037
(9th Cir. 2008).

As established above, the Store was not accessible to disabled persons in February 19,
2018, and it is still not accessible today. Thus, not only did Mr. Lopez personally encounter the
violation, but he faces the threat of continued and repeated violation, particularly in that he
lives only three miles away.

# VI. DEFENSES

In his Memorandum of Contentions of Fact and Law [Dkt. 43], Defendant raises several issues in his defense. However, as will be discussed, these issues are nothing more than sleight of hand which hold no legal weight and are intended to distract the Court's attention away from the facts and law of the case.

## 1.      Defendant's Lease Agreement

Defendant cites his lease, a private contract between him and his landlord to which Plaintiff is not a party, as a ground for why he should not be required to comply with federal law. In his Memorandum, Defendants states: "Pursuant to the terms of the lease, the tenant shall not make any alterations, improvements or additions to the premises without the landlord's prior written consent." Dkt. 43 at 2:5-7. "As the defendant rents from the owner and the owner refuses to consent to defendant's request to make improvements to the property, it is impossible for defendant to comply with any alleged violations claimed by plaintiff." Id. at 2:17-20.

However, such an argument is not a novel issue and Congress, the Department of Justice, and the courts have repeatedly decided against allowing business owners to skirt their obligations under federal law by private contract.

Under Title III of the Americans with Disabilities Act of 1990, the "general rule" applies to every person who "owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The Code of Federal Regulations implementing Title III of the ADA states: "**Both** the landlord who owns the building . . . and the tenant who owns or operates the place of public accommodation are public accommodations subject to the requirements of this part. **As between the parties**, allocation of responsibility for complying with the obligations of this part may be determined by lease or other contract." 28 C.F.R. § 36.201(b) (emphasis added). The language is clear: both parties are liable for violations although one party may be able to seek indemnification under contract theory.

Plaintiff's Trial Brief                                                    Case #: 2:18-cv-03269-MWF-JC

The Technical Assistance Manual to Title III, promulgated by the Department of Justice under the authority of section 506 of the ADA, states the following:

> *Do both a landlord who leases space in a building to a tenant and the tenant who operates a place of public accommodation have responsibilities under the ADA?*
>
> Both the landlord and the tenant are public accommodations and have full responsibility for complying with all ADA title III requirements applicable to that place of public accommodation. The title III regulation permits the landlord and the tenant to allocate responsibility, in the lease, for complying with particular provisions of the regulation. However, any allocation made in a lease or other contract is **only effective as between the parties, and both landlord and tenant remain fully liable for compliance** with all provisions of the ADA relating to that place of public accommodation.

Department of Justice, Technical Assistance Manual on the American with Disabilities Act (BNA) §§ III-1.2000 (1994) (emphasis added).

The illustration found within the Technical Assistance Manual sheds light on this case:

> **ILLUSTRATION**: ABC Company leases space in a shopping center it owns to XYZ Boutique. In their lease, the parties have allocated to XYZ Boutique the responsibility for complying with the barrier removal requirements of title III within that store. In this situation, if XYZ Boutique fails to remove barriers, both ABC Company (the landlord) and XYZ Boutique (the tenant) would be liable for violating the ADA and could be sued by an XYZ customer. Of course, in the lease, ABC could require XYZ to indemnify it against all losses caused by XYZ's failure to comply with its obligations under the lease, **but again, such matters would be between the parties and would not affect their liability under the ADA**.

9

TAM § III-1.2000 (emphasis added).

There is little surprise then that commentators conclude that "[n]o matter how landlords and tenants divide the requirements of Title III compliance, that division of responsibility for compliance applies **only in disputes between the landlord and tenant**, and both parties remain subject to liability for compliance." Paul V. Sullivan, <u>The American With Disabilities Act of 1990: An Analysis of Title III and Applicable Case Law</u>, 29 Suffolk U. L. Rev. 1117, 1127 (1997). Another law review discussing this very topic states:

> Of paramount interest is the uncertainty created in land-lord-tenant relationships as both landlord and tenant are potentially liable for ADA violations. The landlord and tenant can contract the responsibility for compliance with the "public access" provisions in the lease. However, any allocation, subrogation, or indemnification is limited by the parties insurance policies. **Furthermore, under the ADA, the obligated party's failure to comply does not insulate the other party's noncompliance. Allocation is only effective between the parties. Both the landlord and tenant remain fully liable for compliance with all applicable provisions of the ADA.** Thus, both may be considered "public accommodations" responsible for compliance with Title III requirements applicable to places of public accommodation.

Gabreille P. Whelan, <u>The Public Access Provisions of Title III of the Americans With Disabilities Act: A Guide for Commercial Landlords and Tenants</u>, 34 Santa Clara L. Rev. 215, 217-218 (1993) (internal citations omitted) (emphasis added).

10

Courts have identified the practical policy reasons that support this interpretation:

> A customer should not have to obtain a copy of the lease and other contracts in order to determine who is the proper defendant. The customer should be able to bring an action, and let the tenant and landlord fight among themselves over who is responsible to pay for any required improvements.

Indep. Living Res. v. Oregon Arena Corp., 982 F. Supp. 698, 768 (D. Or. 1997) *supplemented,* (D. Or. 1998) 1 F. Supp. 2d 1159.

In fact, this exact defense has been raised in other cases, citing nearly identical lease provisions, to no avail. For example, in Grove v. De La Cruz, 407 F. Supp. 2d 1126, 1132-33 (C.D. Cal. 2005), the court recognized that the Ninth Circuit precedent established in Botosan v. Paul McNally Realty, 216 F.3d 827 (2000), requires the opposite finding:

> Nonetheless, De La Cruz defendants argue that it was not readily achievable for them to remove the architectural barriers, in that they had no legal right to do so. Specifically, De La Cruz defendants point to a provision in their lease with [Landlord] which provides: "Lessee shall not make any alterations, additions, modification, or changes ("alterations") to the leased premises without first procuring Lessor's written consent." Based on this provision, De La Cruz defendants argue that they cannot be held liable for failing to do that which they had no legal right to do.
>
> The ADA's prohibitions against discrimination apply to "any person who owns, *leases* (or leases to), *or operates* a place of public accommodation" 42 U.S.C. § 12182(a) (emphasis added). As a result, "[b]oth the landlord and the tenant are public accommodations and have full responsibility for complying with all ADA title II requirements applicable to that place of public accommodation." *Botosan v. Paul McNally Realty,* 216 F.3d 827, 833 (9th Cir.2000)

---

(quoting Department of Justice, Technical Assistance Manual on the American With Disability Act § III-1.2000 (1994)). A landlord and tenant are permitted to allocate responsibility for compliance with the ADA by lease, but such allocation is effective only "[a]s between the parties." 28 C.F.R. § 12182(a). Accordingly, the Ninth Circuit has held that "a lease allocating liability between a landlord and a tenant does not affect either parties' liability with respect to third parties." *Botosan,* 216 F.3d at 834. Therefore, even if the lease agreement between De La Cruz defendants and [Landlord] arguably allocated responsibility to the latter to make physical alterations to the property necessary to comply with the ADA, such allocation has no affect on De La Cruz defendants' obligations to plaintiff and other members of the disabled community. The Court therefore finds that removal of the architectural barriers was readily achievable.

[Internal citations omitted.]

Therefore, while the prohibition from alterations in Defendant's lease may give rise to a cause of action between Defendant and his landlord, it has no impact on Defendant's obligation under federal laws to non-parties to the lease, including Plaintiff and the disabled community at large.

**2.    Unrelated Litigation**

Defendant has made a point that, in 2013, Plaintiff's counsel represented and obtained a judgment on behalf of a different plaintiff against the then-owner of the property where his Store is located. As Defendant puts it:

> It is also interesting to note that this plaintiff's counsel previously obtained a judgment against the owner of this property on February 19, 2013 in an ADA case entitled Jon Carpenter vs. Consuelo T. Felix(Case No. BC483497—Los Angeles Superior Court) and has never sought to enforce that judgment by requiring the owner to make the required repairs.

Dkt. 43 at 2:24-3:1.

First, this line of reasoning is irrelevant to the facts before the Court in this case. Defendant, and all owners and operators of places of public accommodation, have been obligated by federal law to comply with the Americans with Disabilities Act for the past 30 years. The fact that the then-property owner failed to not only comply with the law but also comply with the court-ordered injunctive relief Mr. Carpenter was awarded bears no relevance on this defendant's similar failure to abide by the law. The law is the law, regardless of whether Mr. Carpenter sought to enforce his injunction. As noted above, the ADA binds both landlord and tenant to provide accessible features. Defendant cannot hide behind the 2013 property owner under the auspices that he, also, broke the law.

Moreover, Defendant's argument is ill-researched. Mr. Carpenter passed away in early 2014, leaving no plaintiff to enforce the injunctive relief awarded in that case.

### 3.   The Repairs are not Readily Achievable

Finally, Defendant makes passing reference to barrier removal not being readily achievable: "Defendant claims that the alleged architectural barrier claimed by plaintiff cannot be removed without great expense or difficulty..." "[t]he cost to install a ramp is cost prohibitive and requires a permit from the County of Los Angeles, which only the owner can obtain." Dkt. 43 at 2:14-16; 2:21-23.

First, the term readily achievable means "easily accomplishable and able to be carried out without much difficulty or expense. 42 U.S.C. § 12181(9). However, as noted in Defendant's responses to Plaintiff's requests for admissions (what will be introduced as Exhibit 9), Defendant is not raising a lack of financial wherewithal as part of a readily achievable defense. Therefore, the expense of barrier removal is no longer a factor to consider in the readily achievable determination, leaving only the difficulty of such remediation.

Plaintiff alleges three barriers: lack of van-accessible parking at the Store, a too-steep entrance ramp, and too-narrow merchandise aisles. The first barrier can be addressed by simply repainting the parking lot so as to provide an accessible parking space able to accommodate a van and wheelchair ramp. The second, by extending the ramp either farther beyond the entrance or farther into the store, so as to achieve a lesser slope. The third, by moving merchandise and displays such that the aisles provide 36" clearance, rather than the current 30". The Department of Justice lists all of these as "examples of steps to remove barriers..." 28 C.F.R. § 36.304(b)(1),(2),(3),(4),(18).

14

However, **even if complete barrier removal is not readily achievable, it is still a violation of the ADA to fail to take alternate measures to maximize accessibility**. The ADA requires that facilities must do **something** to achieve accessibility, even if full compliance is not readily achievable:

> For the purposes of subsection (a), discrimination includes – . . .
>
> (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and
>
> (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

42 U.S.C. § 12182(b)(2)(A)(iv)-(v). In its Safe Harbor provisions, governing dates by which existing facilities must be brought into compliance, the Code of Federal Regulations states likewise:

> If... the measures required to remove a barrier would not be readily achievable, a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with the specified requirements. Such measures include, for example, providing a ramp with a steeper slope or widening a doorway to a narrower width than that mandated by the alterations requirements. No measure shall be taken, however, that poses a significant risk to the health or safety of individuals with disabilities or others.

28 C.F.R. § 36.304(d)(3).

Thus, it is insufficient for the defendant to say that providing a fully compliant van-accessible parking space, accessible entrance ramp, and accessible merchandise aisles is too difficult. Defendant must still establish why he cannot take any alternate steps to provide more compliance than he currently does – why painting a van-accessible parking space, even if the slopes are too great, would be too difficult; why utilizing a portable ramp with slighter slope, railing along the entrance wall to allow wheelchair users to help stabilize themselves, or door buzzer to request assistance at the entrance would be too difficult; why repositioning shelves or using different, narrower merchandise shelves could not provide clearance closer to the 36" required.

However, Defendant cannot support a claim that at least partial compliance is not readily achievable. When Plaintiff's investigator returned to the Store to see whether any progress had been made at barrier removal, he noted the accessible parking space had been repainted and that signage had been installed. This proves as a matter of law that there were some barrier removal measures that were readily achievable. Successful barrier removal moots the readily achievable issue:

> Having found a barrier, the next step is determining whether the removal of the barrier is readily achievable. **Given that the barrier has already been cured, the court must find that it was readily achievable, and thus that it violated the ADA and subsequently the Unruh Act**. In sum, the court finds that the barrier existed, cure was readily achievable, and therefore the barrier violated the ADA and the Unruh Act... Once again, since defendants have already remedied the barrier, the court must find its removal was readily achievable and grant summary judgment to plaintiff under the state law claim.

Wilson v. Pier 1 Imports (US), Inc., 439 F.Supp.2d. 1054, 1069 and 1071 (E.D.Cal. 2006) (emphasis added); *see also* Johnson v. Wayside Property, Inc., 41 F.Supp.3d 973, 978 (E.D.Cal.

16

2014); <u>Whitaker v. BOP FIGAT7TH LLC</u>, 2019 WL 1081207 p.*2 (C.D.Cal. 2019); <u>Kalani v. National Seating & Mobility, Inc.</u>, 2014 WL 1665226 at p. *3 (E.D.Cal. 2014).

The Central District has upheld the proposition that even partial remediation rids the case of the readily achievable debate:

> [D]efendant has already made some of the requested modifications to other rooms and/or sinks within its facility during the relevant time period, . . . thereby demonstrating that the requested modifications were readily achievable.

<u>Montano v. Bonnie Brae Convalescent Hosp., Inc.</u>, 79 F.Supp.3d 1120, 1131 (C.D.Cal. 2015).

In short, Defendants have to at least attempt to comply with federal civil rights law, even where full compliance is not readily achievable.

## VII. THE REMOVAL OF BARRIERS IS AN ONGOING OBLIGATION.

The Americans with Disabilities Act Technical Assistance Manual ("TAM"), Title III makes clear that being grandfathered in is not a defense, as "[t]he obligation to engage in readily achievable barrier removal is a continuing one." TAM § III-4.4400. Rather, the Act requires the removal of barriers, regardless of the age of the property or business: "A public accommodation **shall remove barriers in existing facilities**..." 28 C.F.R. 36.304(a) (emphasis added).

Defendant may allege that he was grandfathered in and, thus, need not comply with the Americans with Disabilities Act. This argument is contrary to the law and Defendant can cite no authority for this position.

17

## VIII. CHALLENGING THE PLAINTIFF'S MOTIVES IS NOT A DEFENSE.

The defense cannot cite any law holding that a plaintiff's internal motivations for going to a place of public accommodation is relevant to a claim that they are being discriminated against with respect to access. Motivations are not relevant. See, e.g., Molski v. Price, 224 F.R.D. 479, 483-4 (C.D. Cal. 2004). In *Molski*, the plaintiff had filed hundreds of ADA cases and testified that he planned on returning to businesses "to see if the services offered are equal for me as they are for you and others who are able to walk" and, also, to "know" that he had access to facilities if he needed to use them. Id. at 481. The *Molski* defendants cried foul and argued that Mr. Molski's motivation to go to these facilities was to further his litigation. Id. at 483. The Court rejected the argument and held that litigation motivation did not matter, i.e., that while a plaintiff's intention to go or not to go to a business mattered, their "motivations" did not matter: "The Court can find **no authority** that suggests that, in order to have standing to assert an ADA Title III claim for injunctive relief, a plaintiff must possess an intention to return to the inaccessible public accommodation that is not motivated in any way by advancing his litigation against that public accommodation." Id. (emphasis added). In fact, the *Molski* court acknowledged the concern that "the plaintiff's trip to the defendants stores was not triggered by a desire to shop in the businesses there, but was rather driven by a desire to ferret out which buildings were in violation of the ADA's accessibility requirements" but, nonetheless, held that the "Court agrees that an ADA plaintiff's motivation—but not his intent—is **irrelevant** for purposes of determining standing." Id. at 483-4.

This premise was recently upheld by the Ninth Circuit. In *Civ. Rights Educ. and Enf't Ctr. v. Hosp. Properties Tr*., 867 F.3d 1093, 1096 (9th Cir. 2017), the Ninth Circuit had to grapple with the question of "whether a plaintiff has constitutional standing where her only motivation for visiting a facility is to test it for ADA compliance." After a thorough analysis of the various circuits that have found that ADA plaintiffs have "tester" standing, the Ninth Circuit found "as a matter of first impression, a plaintiff suing under Title III of the ADA can claim tester standing; plaintiffs' status as testers, rather than bona fide hotel patrons, [does] not deprive

them of standing." Id. at 1093. And the reason is simple: "motivation is irrelevant to the question of standing under Title III of the ADA." Id. at 1102.

## IX. LITIGIOUSNESS OF THE PLAINTIFF IS IRRELEVANT

Mr. Lopez is very active in suing businesses that violate his civil rights. He is a profoundly disabled paraplegic, and understands that federal and state law entitle him to a certain level of physical access at businesses in the State of California. Failure to comply with these laws is discriminatory. The California Supreme Court has called such violations "per se injurious" although it is difficult to quantify damages. Thus, the California Legislature has seen fit to provide that a civil penalty is to be awarded to a plaintiff who brings these cases— regardless of actual damages -- with the express purpose of encouraging enforcement. Mr. Lopez is what the published case law calls a "serial litigator." As discussed below, numerous courts have addressed the standing of serial litigators and ruled that there is nothing wrong with serial litigation and there are no adverse credibility determinations to be made from serial litigation.

The strategy of attacking the plaintiff has become quite common. "These arguments are representative of a troubling trend in which disability access defendants attack the motives of plaintiffs and their counsel in nearly every case brought to enforce the right to equal access guaranteed by the ADA and California statutes." Kittok v. Leslie's Poolmart, Inc., 687 F. Supp. 2d 953, 958 (C.D. Cal. 2009) [a case very similar to the present one, where the court granted summary judgment to a serial plaintiff due to the lack of a handicap parking space]. But the courts that oversee the majority of these cases and encountered these character attacks masquerading as defenses have soundly rejected the concept.

Citing to United States Supreme Court precedent, one federal court noted, "successful ADA plaintiffs confer a tremendous benefit upon our society at large in addition to the attainment of redress for their personal individual injuries... the enforcement of civil rights statutes by plaintiffs as private attorneys general is an important part of the underlying policy behind the law." Walker v. Carnival Cruise Lines, 107 F.Supp.2d 1135, 1143 (N.D. Cal. 2000) [the "benefits of such changes clearly redound not only to the plaintiffs themselves, but to

similarly situated disabled persons, and the entire society at large. As a result, plaintiffs or plaintiff classes who bring suit pursuant to the ADA do so in the role of private attorneys general who seek to vindicate a policy of the highest priority."].

"As a result, most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled. For the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA." Molski v. Evergreen Dynasty Corp. I, 500 F.3d 1047, 1062 (9th Cir. 2007); D'Lil v. Best Western Encina Lodge & Suites, 538 F.3d 1031, 1040 (9th Cir. 2008).

There is simply no relevance to the fact that the plaintiff has successfully prosecuted numerous lawsuits against businesses – like the current one – that are in blatant violation of the law:

> [T]he phenomenon [multiple filings] is a creature of our federal and state statutes and cannot justify the issuing of pre-filing orders that enjoin meritorious lawsuits. Moreover, while self-interest surely drives serial access litigation in part, the reason there can be so many lawsuits about access to public accommodations is that there are so many violations of the laws that seek to assure access, and so many disabled people are thwarted from participating equally in the activities of everyday life.

Molski v. Evergreen Dynasty Corp. II, 521 F.3d 1215, 1220 (9th Cir. 2008). The "simple fact that a plaintiff has filed a large number of complaints" or the "textual and factual similarity of a plaintiff's complaints" is "not a basis" for finding that the plaintiff is involved in vexatious litigation. Molski Evergreen Dynasty Corp. I, supra, 500 F.3d at 1061.

The sheer number of disability access lawsuits filed by an individual plaintiff is not evidence of abuse. Wilson v. Murillo, 163 Cal.App.4th 1124, 1128, fn. 3 (2008). The Wilson court's holding on this issue is directly applicable in this case:

1       While Wilson obviously views himself as a champion of the disabled,

2   he is condemned by Murillo as a serial litigant who exploits the ADA

3   by filing lawsuits with "a clear intent to harass businesses and extort

4   quick cash settlements...." Wilson does not dispute that he has filed

5   many ADA access lawsuits. Numerosity alone, however, is

6   insufficient to show that his lawsuits are frivolous or harassing. One

7   court has examined the contents of Wilson's filings and has made an

8   express finding that his ADA claims are not frivolous and that he is

9   not a vexatious litigant. "From all that appears, the number of

10  lawsuits [Wilson] has filed does not reflect that he is a vexatious

11  litigant; rather, it appears to reflect the failure of the defendants to

12  comply with the law." (*Wilson v. Pier I Imports (US), Inc.* (E.D.Cal.

13  2006) 411 F.Supp.2d 1196, 1200.) This difference in points of view

14  being noted, we emphasize that Wilson's **litigation history is**

15  **immaterial to our resolution of this case**.

16  Id. at 1128, fn. 3 (emphasis added). Thus, any defense attack on Mr. Lopez based on his

17  litigation history has no relevance to the actual issues raised in this individual case. Trying to

18  challenge Mr. Lopez's character due to his litigation history is inappropriate. Consider the

19  following three cases:

20      In *Feezor v. Chico Lodging, LLC*, 422 F. Supp. 2d 1179 (E.D. Cal. 2006), the court was

21  faced with a standing challenge and an attack on the plaintiff's credibility because the plaintiff

22  had filed numerous other cases. The court rejected the implication and stated, "The fact that

23  plaintiff is fulfilling the Congressional purpose when it provided for private enforcement of the

24  ADA is hardly evidence of bad faith." Id. at 1181.

25      In *Daniels v. Arcade, L.P.,* 477 Fed.Appx. 125 (4th Cir. 2012), 2012 WL 1406299, an

26  ADA plaintiff's credibility was likewise challenged due to his litigation history. The court held:

27      The right to sue and defend in the courts... is one of the highest and

28      most essential privileges of citizenship... [and] is granted and

21

protected by the Federal Constitution." Chambers v. Baltimore & Ohio R.R. Co., 207 U.S. 142, 148 (1907). Absent a determination that Daniels has abused those privileges, we will not hold his past participation in the judicial process against him. Accordingly, we conclude that Daniels' litigation history is not relevant to this case.

In *Segal v. Rickey's Rest. & Lounge, Inc.,* 2012 WL 2393769 (S.D. Fla. June 25, 2012), the defense attacked the plaintiff for serial litigation work and argued that, "by filing multiple lawsuits," the plaintiff was "perverting the ADA" and was a "pawn for the generation of attorney's fees." The court rejected the argument, reasoning that "filing suit to remedy architectural barriers constitutes a legal recourse to redress discrimination and allow the disabled to fully participate in all aspects of society" and the court held that, "Plaintiff is not stripped of standing by virtue of the number of lawsuits he has filed."

Mr. Lopez does nothing wrong with filing numerous cases against businesses that are unquestionably violating the law and violating his civil rights. Defendant often seeks to avoid the consequences of his law-breaking by attacking the motivations and character of Mr. Lopez and his attorneys. These defense criticisms are out of place in this suit. These criticisms perhaps should be raised with legislators, but these character attacks are not relevant to a resolution of this case.

# X. CONCLUSION

The Plaintiff respectfully requests this Court review the case law, and consider the uncontested facts. Plaintiff requests the Court enter judgment in his favor on the allegations, listed at the outset of this Brief.

*Amount of Damages, Attorney's Fees and Costs*

Under the Unruh Civil Rights Act, a plaintiff is entitled to a penalty assessment, which can be "no less than $4,000" under the Unruh Civil Rights Act. Cal. Civ. § 52(a). Thus, Plaintiff claims $4,000 in damages as a result of the barriers he encountered. Plaintiff further seeks his reasonable attorney fees, litigation expenses, and costs.

Dated: March 3, 2020                    CENTER FOR DISABILITY ACCESS


By: /s/ Christopher A. Seabock

CHRISTOPHER A. SEABOCK
Attorneys for Plaintiff

23